NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

ELAINE Z., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.C., O.C., *Appellees*.

No. 1 CA-JV 17-0176
FILED 9-19-2017

---

Appeal from the Superior Court in Maricopa County
No. JD15564
The Honorable William R. Wingard, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Maricopa County Public Advocate's Office, Mesa
By Suzanne Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Amber E. Pershon
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Presiding Judge Lawrence F. Winthrop delivered the decision of the Court, in which Judge Diane M. Johnsen and Judge Maria Elena Cruz joined.

---

**W I N T H R O P**, Presiding Judge:

**¶1**        Elaine Z. ("Mother") appeals the juvenile court's order severing her parental rights to T.C. and O.C. ("the children"). Mother contends the court erred in severing her rights based on her length of incarceration for a felony conviction. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

**¶2**        Mother is the biological parent of T.C., born in 2009, and O.C., born in 2012. Mother's rights to two other biological children were severed in 2009.[1]

**¶3**        In 2015, Mother was convicted of mail fraud and aggravated identity theft, and sentenced to six years' imprisonment. As a result, the Department of Child Safety ("DCS") took custody of the children[2] and filed a dependency petition, alleging the children were dependent as to Mother on the ground of neglect.[3] Mother contested the dependency petition. Before the juvenile court ruled on the dependency petition, DCS petitioned to sever Mother's parental rights on two grounds: (1) that Mother could not provide a normal home life for her children due to her incarceration for a felony conviction, and (2) that Mother wilfully abused a child or failed to

---

[1]        In 2007, Mother was convicted of felony child abuse for breaking her eldest child's arm.

[2]        The children were initially placed with relatives in April of 2015; however, due to ongoing therapy requirements, DCS eventually placed the children in foster care and filed the dependency action.

[3]        The children's biological father ("Father"), who is not a party to this appeal, was incarcerated at the time of the dependency petition. Father was released from prison during the dependency proceedings, but his rights to the children were severed concurrently with Mother's in March 2017. Father is not contesting the severance, and is not a party to this appeal.

protect a child from wilful abuse. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(2), (4) (Supp. 2016).

¶4 At a pretrial conference in February 2017, a month before the severance hearing, Mother requested Skype visits with the children while she was incarcerated, and the juvenile court ordered DCS to "look into" the matter. After consulting with the children's therapist and with a psychologist, DCS determined that such visits could retraumatize the children and denied Mother's request. The record does not indicate whether Mother requested an order authorizing phone calls with the children if her request for Skype visits was denied. The last time Mother spoke with the children was in April 2015, before her incarceration.

¶5 In March 2017, the juvenile court held a two-day hearing on the dependency and severance petitions. At the hearing, the DCS case manager testified that Mother would be unable to provide the children with a normal home while incarcerated. The DCS case manager defined a normal parent-child relationship as a relationship in which the parent provides for the child's basic daily needs, including food, shelter, clothing, being with the child at night, putting the child to bed, and taking the child to school. Mother, in this case, would be unable to provide any of these basic daily needs, let alone daily contact, stability, and permanency because of her incarceration.

¶6 Mother testified that before her incarceration, she was the children's primary caregiver, and that she has "a very good relationship" with them. Mother stated that she wrote letters and authored stories for the children while incarcerated and that, as above, she requested video visitation with the children.[4]

¶7 Mother further testified that she is currently incarcerated in California and her expected release date is 2020.[5] However, she stated that she hopes to reduce her sentence by eighteen months by participating in certain programs offered by the prison. Mother acknowledged, however,

---

[4]  Notwithstanding that she earned some wages while employed in prison, there is no indication that Mother provided any monetary support for her children.

[5]  The record contains inconsistent testimony as to Mother's release date. However, the Federal Bureau of Prisons' website indicates a potential release date of August 25, 2020.

that her incarceration "would cause some mental issues and emotional issues" for the children and that it is important for the children to have stability.

**¶8** The juvenile court found the children dependent as to Mother and took the severance petition under advisement. After assessing the *Michael J.*[6] factors, the court severed Mother's parental rights on the basis of her length of incarceration. The court specifically found that "the degree to which the parent-child relationship could be continued or nurtured while Mother [was] incarcerated [was] minimal" and that Mother had "been unable to arrange for any way to speak with the children." The court also found that severance was in the children's best interests.

**¶9** Mother timely appealed, and we have jurisdiction pursuant to the Arizona Constitution, Article 6, Section 9; A.R.S. § 8-235(A) (2014); and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

**ANALYSIS**

**¶10** On appeal, Mother argues the juvenile court's severance order lacks evidentiary support. In particular, Mother argues the court erred in assessing the second *Michael J.* factor when it found that Mother could only minimally maintain a parent-child relationship while incarcerated, and that Mother was unable to arrange a way to interact with the children. Mother maintains the court must reweigh the *Michael J.* factors in light of these purported errors to determine whether severance was proper.

**¶11** We view the evidence in the light most favorable to sustaining the juvenile court's order and will overturn the court's findings only if such findings were clearly erroneous, such that they are not supported by reasonable evidence. *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 2, 982 P.2d 1290, 1291 (App. 1998). Although parents have a fundamental right to raise their children as they see fit, that right is not without limitation. *Minh T. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 76, 79, ¶ 14, 41 P.3d 614, 617 (App. 2001). As relevant here, a juvenile court may terminate a parent's rights if it finds by clear and convincing evidence "[t]hat the parent is deprived of civil liberties due to the conviction of a felony . . . if the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years." A.R.S. § 8-533(B)(4). Additionally, the juvenile court must find by a preponderance of the evidence that

---

[6]     *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 995 P.2d 682 (2000).

termination is in the best interest of the child. *Michael J.*, 196 Ariz. at 249, ¶ 12, 995 P.2d at 685.

**¶12** Under A.R.S. § 8-533(B)(4), incarceration for a period of years is not a *per se* ground for termination. *Id.* at 250, ¶ 22, 995 P.2d at 686. Instead, the court must consider a non-exhaustive list of factors as provided by our supreme court to determine whether termination is appropriate. *Id.* These factors include:

> (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive that child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Id.* at 251-52, ¶ 29, 995 P.2d at 687-88.

**¶13** Contrary to Mother's assertions, substantial evidence supports the juvenile court's findings.

**¶14** In the court's order, it assessed each of the *Michael J.* factors in turn.

**¶15** First, the juvenile court assessed the length and strength of the parent-child relationship that existed when incarceration began. The court found that before Mother's incarceration, she resided with the children and, according to Mother, had a good relationship with the children, participated in daily activities with them, and provided for their daily needs.

**¶16** Second, the juvenile court assessed the degree to which the parent-child relationship could be continued and nurtured during Mother's incarceration. The court found that Mother was unable to nurture the parent-child relationship due to her incarceration. The court specifically found that Mother was unable to arrange for any way to interact with the children and had not been in contact with them since her incarceration in

April 2015.[7] Mother asserts the court's findings were invalid because her request for Skype visits was denied based on DCS's decision, not due to her own lack of effort, and DCS must make an "endangerment" finding before it can deny Skype visits. Mother provides no legal support for this argument. We note that Mother first asked for such visits just a month before the scheduled severance hearing, notwithstanding the fact that she had at that point been incarcerated for many months. We also note there is no evidence in the record to indicate that Mother ever asked for telephone contact with the children.

**¶17** It is well established that DCS is "not required to provide every conceivable service" to a parent, but must provide appropriate remedial services. *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994). Further, this court will not reverse a severance decision based on a parent's unsubstantiated "belief" as to what is in the child's best interests; rather, we will affirm the juvenile court's findings if they are supported by reasonable evidence. *See Michael M. v. Ariz. Dep't of Econ. Sec.*, 202 Ariz. 198, 201, ¶ 11, 42 P.3d 1163, 1166 (App. 2002). Here, DCS's decision to deny Mother's request for Skype visits was based on the informed recommendations of the children's therapist and a psychologist who independently reviewed the therapist's reports. Both mental health specialists opined that Skype visits would retraumatize the children and cause them mental and emotional harm.[8] Thus, the court's finding that Mother was unable to arrange to visually interact with the children was supported by reasonable evidence that such visits, either in person or via an internet connection, would cause the children emotional harm.

**¶18** Third, the juvenile court assessed the children's ages and the relationship between their ages and the likelihood Mother's incarceration would deprive the children of a normal home. The court found Mother's incarceration had deprived the children of a normal home, and would continue to do so. The children were approximately six and three years old,

[7] Although Mother testified that she wrote letters to the children, and the DCS case manager acknowledged that the children received these letters, the record is unclear as to when and how often Mother communicated with the children. Further, there was no evidence offered as to how the children responded, if at all, to Mother's letters.

[8] The record reflects that T.C. had been present during domestic disputes between Mother and Father. On one occasion, T.C. was present when Father hit Mother with a belt and Mother stabbed Father.

respectively, at the time Mother's incarceration began, and Mother's sentence likely will continue until August of 2020. Further, Mother is detained in California, which makes physical contact with the children significantly more difficult.

**¶19** Fourth, the juvenile court addressed the length of Mother's sentence, and considered the total length of time that Mother has been, and will be, absent from the children. *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 281, ¶ 8, 53 P.3d 203, 206 (App. 2002). Here, the court considered Mother's potential release date of August 2020. The court further considered the likelihood that Mother would be unable to immediately reunify with the children after her release due to the anticipated terms of her probation. *See Ariz. Dep't of Econ. Sec. v. Rocky J.*, 234 Ariz. 437, 441, ¶¶ 15-16, 323 P.3d 720, 724 (App. 2014).

**¶20** Fifth, the juvenile court considered the availability of another parent to provide a normal life for the children. The court found that no other parent was available to provide the children with a normal life because Father's rights had been severed.

**¶21** Sixth, the juvenile court considered the effect of the deprivation of a parental presence on the children. The court found the deprivation of Mother's presence did not weigh against severance, given that in her presence, the children had been exposed to considerable trauma.

**¶22** After considering all the *Michael J.* factors as applied to the evidence, the juvenile court found that DCS met its burden of proof. The record, viewed as a whole, fully supports the court's findings. *See id.* at ¶ 17.

**¶23** Mother does not challenge the juvenile court's finding that severance was in the children's best interests. Nonetheless, we note that the record supports the finding. The court found that the continuation of the parental relationship would harm the children because it would force them to remain in foster care during Mother's incarceration. The court also found that severance would allow the children to be adopted by a loving and permanent family that could provide for their daily needs. Further, the court found that, even if DCS's current case plan for adoption does not move forward, the children are nonetheless adoptable. Reasonable evidence supports the court's findings.

**CONCLUSION**

¶24　　　　The juvenile court's order severing Mother's rights to the children is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:　AA